RACHEL P. DILLON, APPELLEE, V. SEARS-ROEBUCK COMPANY ET AL., APPELLANTS.

FILED MARCH 9, 1934. No. 28583.

*Ziegler & Dunn,* for appellants.

*Brome, Thomas & McGuire* and *G. H. Seig, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and PAINE, JJ., and BEGLEY, District Judge.

DAY, J.

Rachel P. Dillon brought this action to recover damages against Sears-Roebuck Company, Fred Arndt, district manager, and Roy Sellers, manager of the Omaha store for the company. From a judgment of $3,000, the defendants appeal. This case was previously heard by this court, an opinion adopted, and a judgment of reversal entered, 125 Neb. 269. Upon an oral argument upon the motion for rehearing, the court has reached a different conclusion.

The plaintiff was employed in an inferior capacity in the Omaha store of Sears-Roebuck Company. This controversy had its inception when one Behr, a private detective, an employee of the Willmark Service System, began a check of the Omaha store under a contract between Sears-Roebuck Company and the Willmark System. A woman detective, assistant to Behr, purchased a paint brush from plaintiff, who then was a saleslady in the paint department, for $1.15. In a few minutes, she took it back and exchanged it for one costing $1.10 additional. It was and is the claim of defendants that plaintiff handled this transaction in an irregular manner. Behr directed some employee of Sears-Roebuck, he says Sellers, manager of the local store, and she says the manager of the paint

department, to send her to him for an interview about this transaction. In any event, she was soon closeted with Behr in an office upon the fourth floor of the store. The testimony as to what happened there is largely in conflict. However, this is a law case, not triable *de novo* in this court, and the sole question for determination is the sufficiency of the evidence to support a verdict. *Eggleston v. Quinn*, 88 Neb. 775.

Plaintiff testified that the paint brush transaction was discussed immediately; that she told him what she still claims were the facts; that she made out a ticket in the exchange book and required the purchaser to sign it and laid it upon the cash register with the money. She had to get an "O. K." from the manager and take it to the cashier on the next floor; that a number of customers requiring attention delayed her, and that when she returned, the money and slip were gone. She told Behr that she would make it good. He then stated that she would have to sign a statement to that effect. He prepared a statement which she signed and it is as follows:

"I, Mrs. Rachel Dillon, age 18, married, residing at 2631 Capitol Ave., Omaha, Nebraska, have been in your employ since about Feb. 1, 1930.

"On July 15, 1930, I sold to a customer one paint brush for $1.15, and the customer later exchanged this brush for one selling for $2.25. The customer gave me the difference of $1.10, and I did not record this amount but kept it for my personal use.

"*This statement was typewritten at my request by Mr. Fred M. Behr, and I have read it over thoroughly and know it to contain nothing but the truth. I am signing this on my own free will, without threat or promise from any one present, and I have been spoken to in a gentlemanly and courteous manner.*" (Italics ours.)

Taking the inference most unfavorable to the plaintiff, this was evidence of an admission against her positive sworn testimony that she did not steal the money but that it was lost as she stated. The jury could with propriety

determine that she was careless and negligent rather than that she was a thief. We will discuss this statement later in connection with a second one signed at the same interview.

However, this detective who wrote this statement at plaintiff's request, a thing almost incredible, admits that the last paragraph was in his words and his idea and not suggested by her. It seems that the jury might conclude also that the statement that she kept the money for her own use was also his idea and in his words. Would any one be so credulous as to believe in view of all that transpired that afternoon that Behr would have been satisfied with or accepted anything different?

However, in connection with this transaction, it is interesting to note that the executives of the defendant company were as vague in their notion as to the manner in which such an exchange should be handled by a saleslady as plaintiff. Arndt, who was district manager in charge of five retail stores for Sears-Roebuck Company, testified upon the second trial of this case, a long time after this controversy, when this had been engaging his attention, the method by which an exchange of this kind should be handled. Sellers, the local manager of the store, testified that the transaction should be handled in an entirely different manner, and, as a part of his examination, he made a sample record on their forms showing the correct method. Shinstock, the assistant manager for the defendant, criticized the model, offered in the record as exhibit 5, as having two important omissions. Yet these defendants were, and in this lawsuit are, holding this 18-year-old girl, who was occupying an inferior position, to a strict knowledge of and a strict accountability to the rules concerning which the highest executives of the defendant company had different ideas. In fact, Arndt later took the stand and stated that he was mistaken as to the requirements of the rules. Under such circumstances, the contention of the plaintiff that her action was a mere irregularity and she was negligent in losing the

money is as justifiable a conclusion as that of the private detective that she was a thief, and this conclusion is reached without any consideration of motives or interests on the part of this detective to find some clerk stealing from the store. "An admission made by a party which is inconsistent with his testimony goes merely to the credibility of the witness." 3 Jones, Evidence (2d ed.) 1973.

The discussion of the paint brush episode required about five minutes. Behr then questioned her about stealing other money. Plaintiff testified that he told her that they had a "whole bin full of merchandise" in the shipping department for which she had kept the money, which was untrue. She also testified that he called Mr. Sellers to the office, and that after a conversation he told Behr that the amount of money which plaintiff had taken on account of this merchandise was $850. This was denied by Sellers and by Behr. Behr testified that she stated she had been taking money in this same way during the time of her employment, which was six months, and that she told him she thought it would average about $5 a day; that he figured six months, 27 days to the month, and $5 a day, by which he arrived at the figure of $850. This indicates that Behr's arithmetic was as bad as his detective work, because, figured on that basis, it would only amount to $810. Furthermore, the defendants introduced as exhibit 8 a report of sales for March, April, May, and June, 1930, four of the six months the plaintiff was employed, and this exhibit establishes the fact that March, April, and May had 26 days each, while June had 25 business days. February, another month of this period had only 24 business days in 1930. The evidence also establishes that for one month of the six months' period, the plaintiff was working on the elevator and handled no money, and for the rest of the time, except for the last two weeks when she worked in the paint department, that her average sales were only $14 or $15 a day. The defendant offered testimony showing the department sales to be much larger, but she was not the only saleslady in the

department, and they made no effort to introduce evidence as to the plaintiff's sales, which were undoubtedly shown by their records. The only conclusion that can be reached from this testimony, relating to whether or not the plaintiff had stolen the $850 mentioned in the second statement, is that there is no foundation in fact for the statement. At the time, Behr did not know that Sears-Roebuck Company had lost $850. Sellers, manager of the local store, said that he knew of no such shortage and such a shortage could not exist without his knowledge. He also testified that they had taken an inventory July 1, 14 days earlier, and that, with their system of running inventory, they could check in 12 hours and determine whether the inventory, compared to the sales, would indicate a loss. But, under these circumstances, Behr is determined to get a statement from the plaintiff that she had stolen $850. The statement has a striking similarity to the first except as to amounts and follows:

"I, Mrs. Rachel Dillon, age 18, married, residing at 2631 Capitol Ave., Omaha, Nebraska, have been in your employ since about Feb. 1, 1930.

"During the last five and one-half months, I have taken money from sales that I made but did not record, to the amount of Eight Hundred and Fifty Dollars ($850). This money I used for my own personal use, and I realize I have broken a store rule, by handling these sales in this manner.

"*This statement was typewritten at my request by Mr. Fred M. Behr, and I have read it over and know it to contain nothing but the truth. I am signing this statement on my own free will, without threat or promise from any one present, and I have been spoken to in a gentlemanly and courteous manner.*"

The italics in this statement are ours and call attention to the fact that it was prepared by one experienced and accustomed to this sort of thing. The plaintiff testified that she protested that she had not stolen this money but that he insisted that he had the proof; that she asked that

she be permitted to call her husband by telephone and reached for the phone, but that "he pushed it away from me and he kept insisting that if I didn't sign this, they would send me to jail." She was in this room on the fourth floor alone with Behr, and the door was shut. She was crying and hysterical. She did not try to leave, because he said that, if she tried to leave, they would send her to jail. She was in this office with Behr, according to her testimony, 45 minutes. Behr says that it was about an hour and 40 minutes and that practically all of the time was spent upon this $850 transaction. Sellers testified that it was his opinion that he took her to Behr's office at 10 minutes to 1 and that she was there until 3 o'clock.

Again we want to direct our attention to the last paragraph of the second statement. A former judge of this court, Judge Howell, in *Folts v. Globe Life Ins. Co.*, 117 Neb. 723, used a quotation of Ben Jonson, which is so applicable here that we repeat it: "The dignity of truth is lost with much protesting." This whole transaction indicates third degree methods, particularly when there was no loss of $850. The manner and method used in this case was calculated to terrorize an 18-year-old girl in her situation. That it did terrorize and intimidate her and prevent her from leaving the office is supported by evidence of the fact that she was crying; that she wanted to call her husband to her side, and that she signed an untrue statement admitting that she had misappropriated her employer's money.

Behr testifies that plaintiff told him about her theft of $850 and requested him to write the statement concerning it. Apparently he would have it believed that it required one hour and 40 minutes for her to persuade him to perform this arduous task. The appellant places much emphasis upon the fact that plaintiff remained in the store a half hour after she was released by Behr to see defendants Arndt and Sellers, but it must be remembered that at this time the detective had accomplished

his purpose and had a signed statement that she had taken for her own use $850. When a half hour later she did see Arndt and Sellers, she was still crying. Under somewhat similar circumstances, other courts have held that the question whether the defendants' acts amounted to a false imprisonment was a question for the jury if the evidence was sufficient to support a verdict for the plaintiff. See *Fleisher v. Ensminger* (1922) 140 Md. 604; *Coolahan v. Marshall Field & Co.*, 159 Ill. App. 466; *Moore v. Thompson*, 92 Mich. 498; *Mali v. Lord*, 39 N. Y. 381.

Appellants Arndt and Sellers contend that they had nothing to do with this affair. Let us examine the record. Sellers took her to the fourth floor office and turned her over to Behr who told him to leave. There is a conflict of testimony, but plaintiff testifies that Sellers came up and talked with Behr during the time about the $850. Arndt was in an adjacent office some of the time. He procured a typewriter for Behr to write the so-called confessions. This was done within five minutes of the commencement of the affair. The statements disclose, as does the testimony, that both Arndt and Sellers were called in by Behr to sign as witnesses. Both read them before signing, but they did not protest or make any suggestions, although they did not know of any such loss. During the time this drama was being enacted, Behr was undoubtedly master of ceremonies, but Arndt and Sellers were appearing when and if Behr gave them their cue. Afterwards Arndt had plaintiff in his office and talked to her. She testified the conversation concerned her ability to pay Sears-Roebuck Company the $850. Arndt testified as follows: "She came into my office, and I asked her if she realized that she was in a pretty serious mess. She took a few moments and finally shook her head to indicate yes. I was rather curious to know how she spent the money. I asked her whether they were buying an automobile or radio or something of that order. She said, 'No.' I asked her whether she had any way of making good any of the amount, and she said, 'No,' and that was

the end of our conversation." Arndt then left his office, and plaintiff was in the hands of Sellers. Plaintiff testified that Sellers inquired whether they had an automobile or radio or property of that kind and how she expected to pay the $850. She did not make a statement to Sellers that she had taken the money because she needed it. When Mr. Sellers asked her if they had any property or any automobile or radio or things of that sort, he asked it in connection with whether they could pay Sears-Roebuck Company the $850.

Plaintiff's husband testified that, when his wife came home, he went to see Sellers. He met him on the first floor, and he took him upstairs to talk to him about it. "On the way up, he told me how well he liked my wife and that she was a nice girl. * * * He asked me how we were going to pay it back. I says, * * * 'We have nothing.' I says, 'I don't believe my wife is guilty of the things you have charged her with anyway.' Then he mentioned the $1.10 and asked if I believed that, and if I expected them to believe it. * * * Then he asked me if we had anything that could be used as security until I could raise the money, and I said, 'No.' He said, 'Well, you will have to get me $350 in cash by tomorrow afternoon, and a note for $500, or I will have to send your wife to jail.' I asked him how he expected me to get that, and he says, 'That is not my worry. You will have to get that your own way.' "

Sellers' version of his conversations with the plaintiff and her husband as it appears in the record is that he said, " 'Rachel, for goodness' sake, what did you do this for?' She just sat there and says, 'I don't know.' * * * I says, 'You go home and stop crying. Go home and come back tomorrow afternoon at 3 o'clock and we will talk this thing over;' " that he said nothing to her about a car or a radio; that he never saw her again until in court. He thinks he asked her if she had anything to pay it back with, and she said "No." And she said that Harold had been sick and that they had bills. That he had a con-

versation with her husband in which he asked if any of their relatives had any way to pay back the money and told him to come back tomorrow with his wife. That he did not make a statement that unless they pay $350 and sign a note for $500 he would send her to jail.

Because of the former opinion, which placed considerable credence in the statements signed by plaintiff, it has been necessary to state the evidence at some length. This court does not decide disputed questions of fact, and, upon appeal, the only question presented is the sufficiency of the evidence to support the verdict. In the determination of this issue, the evidence must be considered most favorably for plaintiff with every reasonable inference in her favor. *Wells v. Cochran,* 78 Neb. 612.

Is the evidence upon false imprisonment sufficient to support the verdict? The essential thing to constitute an imprisonment is restraint of the person, which may be by threats as well as by actual force, and if the words and conduct are such as to induce a reasonable apprehension or fear of force, of disaster, or disgrace, a person may be as effectually restrained and deprived of liberty as by prison walls.

"Any intentional conduct chargeable to defendant, that results in placing of a person in a position where he cannot exercise his will in going where he may lawfully go, may constitute false imprisonment." 25 C. J. 452. See *Whitman v. Railway Co.,* 85 Kan. 150. Where plaintiff is detained for a refusal to comply with a condition which defendant has no right to impose, defendant is liable. *Beaver v. Cohen,* 162 N. Y. Supp. 160.

"In ordinary practice, words are sufficient to constitute an imprisonment, if they impose a restraint upon the person, and the party is accordingly restrained; for he is not obliged to incur the risk of personal violence and insult by resisting until actual violence be used." *Martin v. Houck,* 141 N. Car. 317.

"Apprehension or fear by which a person is restrained of his liberty may consist in his fear of some injury

either to his person, reputation or property." *Robinson & Co. v. Greene,* 148 Ala. 434.

The plaintiff's evidence, corroborated by even the witnesses for defendant, is sufficient, if believed by jury, as it was, to show restraint of plaintiff for an unlawful purpose by threats of arrest and being sent to jail with all that means to an 18-year-old girl. However, some physical force was present when she was prevented from calling her husband to come to her assistance. The fact that she signed an alleged confession which obviously could not be true demonstrates the fear and apprehension which had possession of her. The jury saw the parties and were able to determine the effect of the threats better than this court can from the cold record. The evidence was ample.

The appellants, in the second argument, relied upon the proposition that plaintiff was an employee and defendants had a right to interview her about the business during business hours, because she was compensated for her time. They cite *Weiler v. Herzfeld-Phillipson Co.,* 189 Wis. 554. This case is somewhat different in that the employee involved therein was interviewed by one directly over her, while the company in this case secured an expert. The court said: "There is further evidence that he threatened to call the patrol and send her to jail if she did not confess. We cannot express our entire approval of this conduct on the part of Mr. Carter. It savors too much of third degree methods. It was one of the means adopted by Carter to coerce a confession from the plaintiff. It amounted to intimidation, and tended to deprive the plaintiff of her own free will. That, however, bears only upon the value of her confession as evidence." An admission made under duress is of no probative value, is incompetent and inadmissible. This is mentioned for that we are urged that, since plaintiff admitted a theft, she was beyond the protection of the law.

Returning to the *Weiler* case, we decline to follow the rule that an employer has a right to hold an employee in

restraint for the purpose of questioning offensively upon an unwarranted suspicion. We believe that the error in that is this, that an employer is not entitled to restrain an employee under any circumstances. The employee may wish to terminate his employment. Surely an employee is not compelled to continue an employment for the purpose of submitting to third degree methods.

To announce a doctrine that employees may be compelled against their will to submit to indignities such as plaintiff in this case was subjected to, because she was an employee and was compensated for her time, would be equivalent to saying that an employer can compel one to continue the employment against his will. The same court has held that similar circumstances constitute false imprisonment of one not an employee. See *Cobb v. Simon,* 119 Wis. 597.

Was Sears-Roebuck Company liable for the acts of Behr, Arndt, and Sellers? Behr was not a direct employee of Sears-Roebuck Company, but he was there by virtue of a contract between the company and his employer. His acts were done within the scope of his authority. It is contended by the appellants that he was an employee of an independent contractor, and, in this connection, personal injury cases and cases coming under the workmen's compensation acts are cited. We do not think that these are applicable. Behr as a representative of Willmark System was placed in the Omaha store for the purpose of testing employees and finding irregularities and the interview with the plaintiff was within the scope of his authority. This is not to say that the employer directly approved of the manner, although Arndt and Sellers assisted him during this transaction at his request. This was sufficient, we think, in view of the fact that, in doing so, they were doing what their employer required them to do. Arndt and Sellers were employees of the defendant and in charge of the Omaha store as managers for Sears-Roebuck Company, and being on the property and in charge of it were acting in the scope of their authority

as agents of the defendant. See *McClure Ten Cent Co. v. Humphries,* 33 Ga. App. 523. In this case, it was also held that where a detective, not an employee of defendant but of others, stopped and ordered plaintiff to accompany her, which invitation was concurred in by an employee of the defendant, the defendant was liable. It was held that whether the detective was acting in the interests of the defendant or of some other mercantile establishment, such an employee of the defendant having participated in the transaction, and treating her as having stolen from the defendant, acted within the scope of her authority as agent for the defendant. In *Kelly v. Shoe Co.,* 190 N. Car. 406, it was held that the "term 'manager,' applied to an officer or representative of a corporation, implies the idea that the management of the affairs of the corporation has been committed to him with respect to the property and business under his charge, consequently, his acts in and about corporation's business, so committed to him, are within the scope of his authority." In *Johnson v. Bouton,* 35 Neb. 898, it was said: "The rule is that any one who aids or assists in the unlawful imprisonment of another is chargeable as a principal." See, also, *Painter v. Ives,* 4 Neb. 122; *Fox v. McCurnin,* 205 Ia. 752; *Scott v. Flowers,* 60 Neb. 675. In the last case, Scott filed a complaint charging Sarah Jane Flowers with incorrigibility. The county court committed her to the industrial school for girls at Geneva. After she was released, an action for damages was brought against Scott. In the opinion it says: "It is argued by the same counsel that the consequential loss resulting to plaintiff is not the basis of an action for false imprisonment against Scott, since, had the county court performed its duty, there would have been no false imprisonment. It is true that the court made the finding and order of commitment; but the false imprisonment would not have occurred if no complaint had been filed. Defendant instituted the proceeding which resulted in the imprisonment of the plaintiff, and he cannot escape liability because some one

else equally with him was guilty of the wrong. Tortfeasors are jointly and severally liable for the damages flowing from their acts. And it is no answer to say that plaintiff has a right of action for false imprisonment against the county judge." The defendant Sears-Roebuck Company in this case through its contract with the Willmark System placed Behr in its store for the very purpose of apprehending dishonesty among the employees. In addition to this, its managers were authorized and directed to cooperate with him. It did in this case approve of irregular restraint of the plaintiff and sought to reap the benefits of it. This also answers the contention of the liability of Arndt and Sellers. Arndt was district manager for the defendant company and Sellers was the manager of the local store. The connection of these two defendants with the transaction has already been stated. It was such as to show not only an active participation in but an approval and ratification of the illegal restraint of the plaintiff.

There are certain assignments of error relating to the instructions which are unnecessary to discuss because of the views of this court as to the law of this case which would make them clearly improper. There is, however, a complaint that the verdict is excessive which requires our attention. It is difficult to determine just what the damages should be for a false imprisonment of this sort. Actual damages, as well as damages for mental suffering endured because of the false imprisonment, are recoverable. Worry, as well as indignity, humiliation, disgrace, and injuries to the feelings, are proper elements of mental suffering. These are matters which cannot be measured with accuracy. However, this court is of the opinion, after a consideration of the evidence, that that part of the verdict over $1,800 is excessive. It is therefore ordered that, if the plaintiff file a remittitur of $1,200 within twenty days, the judgment shall stand affirmed; otherwise, the judgment shall be reversed and the cause remanded.

AFFIRMED ON CONDITION.

PAINE, J., dissenting.

An opinion was released in this case July 20, 1933, in which four judges of the supreme court sat, and three district judges, and in that opinion only one judge dissented. It was argued again to this court on January 15, 1934, and three judges sat who had not heard the case before. I voted for the opinion, found in 125 Neb. 269, and no new facts were brought out in the second argument, or new law presented, which have changed my mind. Plaintiff brings suit for false imprisonment, and, instead of proving her case by a preponderance of the evidence, her evidence as to imprisonment is entirely uncorroborated in any particular by the three other witnesses who were present at any time during her alleged incarceration.

In an exchange for a more expensive paint brush, she received $1.10 additional in cash, which she failed in any way to account for or ring up on the cash register. The representative of the Willmark System examined the cash register tape and found that the $1.10 had not been recorded, and she explained in the manager's office that she kept the money because she needed it for bills because of sickness. He denies that she said to him that she left it on the cash register and it disappeared. After she had signed the two confessions, admitting taking money, she went to the rest-room, where she remained 30 minutes, and then she voluntarily went back to the manager's office, and Mr. Sellers asked her why she had done it, and she answered she did not know. He told her to stop crying, to go home and come back the next afternoon, and the next day she promptly went to an attorney's office and began an action for false imprisonment for $50,000. The testimony of the man who examined her was that the door was not closed, and remained open all the time that she was in the room. The testimony is not disputed by her that, up to the time that she signed the confession of taking the first $1.10, no threats of any kind had been made to her, and that she signed the first confession of

her own free will. The manager of the store was in his office, through a very thin board partition, and heard the hum of conversation, but not the words, and said that the entire conversation was conducted in a low tone by both of the parties. The only force used, that the plaintiff testified to, was this: That at one time she started to reach for a telephone on the table to call her husband, and that the telephone was pushed beyond her reach. This is absolutely denied, and rests solely upon her own evidence, and is disproved .by two facts, namely, that when she was voluntarily remaining in the rest-room for 30 minutes, after the confession was all completed, she had no desire to, and did not, telephone her husband,· and that when she voluntarily went back later to the office of the manager of the store to talk the matter over with him, and he asked her if she ought not to call her husband, she replied that her husband was not at home.

The evidence appears to show that this investigator was careful and cautious, his business was to detect stealing on the part of dishonest employees, and that from past experience, if for no other reason, he avoided the very things charged in this case. When she did confess, without any threats being made to her, by her own testimony, to the taking of the first $1.10 which she did not ring up because she needed it to pay bills because of sickness, he naturally asked her whether she had ever taken any other money belonging to the firm, and she admitted that she had been taking about $5 a day, and signed a written confession of this fact. This was her own confession, sitting quietly in the office, and of a fact not known to the investigator at all. The burden was upon the plaintiff to prove an unlawful restraint of her liberty. Taking her own testimony that she was called to the manager's office and talked with an investigator in a room to which the door was closed a portion of the time and open a portion of the time, and the only force used, according to her own testimony, was in pushing a telephone beyond

her reach, all of which facts are entirely unsupported by any other evidence, such evidence, I submit, does not prove her case by a preponderance of the evidence, and I am still of the opinion that our first opinion was right.